UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD WILSON,

                             NO. CIV.S-05-1239 LKK/DAD

       Plaintiff,

                             <u>O R D E R</u>

    v.

HARIA and GOGRI CORP. dba          **TO BE PUBLISHED**
JACK-IN-THE-BOX #551; OPT
GOLDEN HILLS VAC, LLC,

       Defendants.
_____/

     Plaintiff alleges that defendant violated the Americans with Disabilities Act ("ADA") and California's Unruh Civil Rights Act ("Unruh Act") by failing to remove architectural barriers at its restaurant. Pending before the court is plaintiff's motion for summary judgment. The court previously stayed the motion pending the potential resolution of a question of state law by the California Supreme Court.[1] This court now

---

    [1] As discussed below, the California Supreme Court subsequently denied review of an intermediate appellate court decision that could have provided definitive guidance on whether plaintiffs must prove intentional disability discrimination under the Unruh Act to obtain damages.

resolves the matter based on the parties papers and after oral argument.

For the reasons set forth below, the motion is granted.

### I. Facts[2]

Plaintiff Ronald Wilson is a 70 year old disabled man. Plaintiff suffers from severe idiopathic neuropathy, peripheral neuropathy ("silent disease") with symptoms of ALS (a.k.a. Lou Gehrig's disease), and motor-sensory neuropathy.[3]  Decl. of Ronald Wilson ("Wilson Decl.") ¶ 3.  Because of his condition, plaintiff experiences stiffness, muscle twitching, shaking, weakness, and spasms.  Id.  When traveling in public, plaintiff uses a cane, wheelchair, or both.[4]  Plaintiff also owns a van with a spinner knob and has been issued a disability placard by the state of California.

Plaintiff regularly visits the defendant Haria and Gorgri Corporation's restaurant, a Jack-in-the-Box.  He retained receipts to the restaurant from thirteen separate visits over 2005-2006.  Wilson Decl. ¶ 11.  In each of these visits, plaintiff alleges that there were several architectural barriers in place that prevented plaintiff from enjoying full and equal access to the goods and services at the

---

[2] All facts are undisputed unless otherwise noted.

[3] At several points, defendant notes that the only evidence supporting plaintiff's factual allegations is his own declaration. This is, however, sufficient to meet plaintiff's initial burden on summary judgment, and as defendant repeatedly fails to tender any probative evidence in opposition, the court may appropriately treat these allegations as effectively undisputed.

[4] Defendant notes that, on one occasion in 2006, the owner and operator of the restaurant allegedly observed plaintiff walking without the assistance of a cane or a wheelchair.  Decl. of Maheshkumar Gogri ("Maheshkumar Decl.") ¶ 4.

1  restaurant.

2      There is no dispute that after commencement of the instant suit,

3  at least some of these barriers were removed.[5]  Plaintiff maintains,

4  however, that there are six outstanding barriers that had yet to be

5  remedied as of August 24, 2006.  Wilson Decl. ¶ 16.  Specifically,

6  plaintiff identified the following six barriers: (1) the cut-out curb

7  ramp had a slope of 8.8% at the top and 12.6% at the bottom; (2) the

8  door to the men's restroom did not have a 12-inch strike side

9  clearance on the push side, the door pressure was 12 pounds, and the

10 door did not open to a full ninety degrees; (3) the toilet paper

11 dispenser was 42 inches from the back wall; (4) the restroom

12 handle/lock was not accessible; (5) none of the accessible seating in

13 the restaurant was designated as accessible with signage; and (6) the

14 disabled parking space lacked the words "No Parking" painted in the

15 access aisle.  Id.

16     With respect to at least two of the barriers, defendant claims

17 that they have been remedied as of November 27, 2006 (the date that

18 the declaration of Maheshkumar Gogri was executed).  First, defendant

19 contends that the words "no parking" are now painted in the access

20 aisle of the disabled parking spot.  Gogri Decl. ¶ 11.  Second,

21 defendant maintains that the toilet paper dispenser is now in

22 compliance with all regulations.  Id.  However, plaintiff visited the

23 restaurant on November 30, 2006 and took photographs that show that

24 ────────────────────

25     [5] Defendant does not dispute that these barriers were in
   existence at the time of plaintiff's visits but merely claims that
26 they have since been remedied.

3

1  the dispenser is still 42 inches from the back wall.  Wilson Decl. II,

2  ¶ 3(c), Ex. E.

3       With respect to the issue of signage for accessible seating in

4  the restaurant, defendant contends that the placards are often stolen,

5  vandalized, or otherwise obscured by customers, and that it is the

6  policy of the restaurant to replace the placards in such

7  circumstances.  Id.  Accordingly, defendant states that if plaintiff

8  observed the absence of required signage, it was because the placards

9  were in the process of being replaced.  Id.  When plaintiff visited

10  the restaurant on November 30, 2006, he found that the signage was

11  still missing, and took photographs to document his observations.

12  Wilson Decl. II, ¶ 3(f), Ex. F.

13                          **II. Standard**

14       Summary judgment is appropriate when it is demonstrated that

15  there exists no genuine issue as to any material fact, and that the

16  moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

17  P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157

18  (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

19       Under summary judgment practice, the moving party

20       [A]lways bears the initial responsibility of informing
         the district court of the basis for its motion, and
21       identifying those portions of "the pleadings,
         depositions, answers to interrogatories, and admissions
22       on file, together with the affidavits, if any," which it
         believes demonstrate the absence of a genuine issue of
23       material fact.

24  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

25  nonmoving party will bear the burden of proof at trial on a

26  dispositive issue, a summary judgment motion may properly be made in

                                 4

reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The opposing party must demonstrate that the fact in contention is

1   material, i.e., a fact that might affect the outcome of the suit under

2   the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3   (1986); Owens v. Local No. 169, Ass'n of Western Pulp and Paper

4   Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv.,

5   Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

6   1987)), and that the dispute is genuine, i.e., the evidence is such

7   that a reasonable jury could return a verdict for the nonmoving party,

8   Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g &

9   Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

10       In the endeavor to establish the existence of a factual dispute,

11   the opposing party need not establish a material issue of fact

12   conclusively in its favor.  It is sufficient that "the claimed factual

13   dispute be shown to require a jury or judge to resolve the parties'

14   differing versions of the truth at trial." First Nat'l Bank, 391 U.S.

15   at 290; see also T.W. Elec. Serv., 809 F.2d at 631.  Thus, the

16   "purpose of summary judgment is to 'pierce the pleadings and to assess

17   the proof in order to see whether there is a genuine need for trial.'"

18   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

19   committee's note on 1963 amendments); see also Int'l Union of

20   Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska,

21   Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

22       In resolving the summary judgment motion, the court examines the

23   pleadings, depositions, answers to interrogatories, and admissions on

24   file, together with the affidavits, if any.  Rule 56(c); see also In

25   re Citric Acid Litigation, 191 F.3d 1090, 1093 (9th Cir. 1999).  The

26   evidence of the opposing party is to be believed, see Anderson, 477

6

1   U.S. at 255, and all reasonable inferences that may be drawn from the

2   facts placed before the court must be drawn in favor of the opposing

3   party, see Matsushita, 475 U.S. at 587 (citing United States v.

4   Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  See also

5   Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 (9th

6   Cir. 2000).  Nevertheless, inferences are not drawn out of the air,

7   and it is the opposing party's obligation to produce a factual

8   predicate from which the inference may be drawn.  See Richards v.

9   Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

10  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

11      Finally, to demonstrate a genuine issue, the opposing party

12  "must do more than simply show that there is some metaphysical doubt

13  as to the material facts. . . . Where the record taken as a whole

14  could not lead a rational trier of fact to find for the nonmoving

15  party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S.

16  at 587 (citation omitted).

17                              **III. Analysis**

18      Plaintiff moves for summary judgment against defendant Haria and

19  Gogri Corp, seeking damages under state law and injunctive relief

20  under the ADA.  With respect to damages, defendant argues that, in

21  light of recent California case law, proof of intent to discriminate

22  on the basis of disability is required for damages under section 52(a)

23  of the Unruh Act.  With respect to injunctive relief, defendant

24  contends that the alleged violations have either been remedied or

25  would cost too much to remedy, and that the alleged violations do not

26  render the restaurant or its facilities inaccessible.  For the reasons

                                    7

1  set forth below, plaintiff's motion is granted.

2  **A. ADA Claim**

3  Title III of the ADA prohibits discrimination against people

4  with disabilities in places of public accommodation.  42 U.S.C. §

5  12182(a).  One form of such discrimination is the failure to remove

6  architectural barriers.  24 U.S.C. § 12182(b)(2)(A)(iv).  In order to

7  prove discrimination stemming from an architectural barrier, plaintiff

8  must demonstrate that (1) he is disabled, (2) the facility in question

9  is a place of public accommodation, (3) the facility contains an

10  architectural barrier, (4) the plaintiff had actual knowledge of the

11  architectural barrier precluding his full and equal access to the

12  facility.  42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(iv), 12188(a).

13  There is little dispute that most of these elements are present

14  in the case at bar.  First, given that plaintiff is unable to walk

15  without the use of a mobility aid (e.g., wheelchair or cane), there is

16  no genuine dispute that he is disabled within the meaning of the ADA.[6]

17  See 42 U.S.C. § 12102(2)(A) (defining disability as a physical or

18  mental impairment that substantially limits a major life activity).

19  Second, a restaurant is a place of public accommodation.  42 U.S.C. §

20  12181(7)(B).  Third, assuming the alleged architectural barriers

21

22  [6] The fact that defendant asserts that plaintiff was observed
walking without the aid of a cane or wheelchair on one occasion is
23  not sufficient to create a genuine dispute regarding this issue.
Gogri Decl. ¶ 11.  Such an event would not negate the fact that
24  plaintiff's numerous medical conditions nevertheless constitute a
substantial limitation on his ability to walk.  See 29 C.F.R. §
25  1630.2(j) (defining substantial limitation as either a total
inability to perform major life activity or a significant
26  restriction on the same).

1  exist, plaintiff satisfies the requirement of actual knowledge, given

2  that he personally encountered them during his multiple visits to the

3  restaurant.  Fourth, while defendant would ordinarily be entitled to

4  prove that the removal of the alleged architectural barriers is not

5  "readily achievable" (given that the facility was in existence prior

6  to the passage of the ADA in 1993), the court holds that this is an

7  affirmative defense, which defendant has waived.[7]  Accordingly, the

8  only remaining issue is whether the architectural barriers alleged by

9  plaintiff were in place during his visits, and whether they continue

10  to exist.

11  ///

12

─────────────

13      [7] The Ninth Circuit has yet to rule on this issue, but courts
    are generally in agreement that whether barrier removal is readily
14  achievable  is  an  affirmative  defense.   See  Colorado  Cross
    Disability Coalition v. Hermanson Family Ltd. P'ship, 264 F.3d 999,
15  1002-03 (10th Cir. 2001); Gathright-Dietrich v. Atlanta Landmarks,
    Inc., 452 F.3d 1269, 1274 (11th Cir. 2006).  See also Lentini v.
16  Calif. Ctr. for the Arts, 270 F.3d 837 (9th Cir. 2004) (holding
    that whether an accommodation "fundamentally alters" a service or
17  facility is an affirmative defense).
        In Colorado Cross, the Tenth Circuit established a burden-
18  shifting framework in which the plaintiff bears in the initial
    burden of production but the defendant bears the ultimate burden
19  of persuasion.  264 F.3d at 1002-03.  The plaintiff must first
    suggest a method of barrier removal and proffer evidence that the
20  method meets the statutory definition of readily achievable.  Id.
    Thereafter, the burden shifts to the defendants to rebut that
21  showing  and  prove  that  the  suggested  method  is  not  readily
    achievable.  Id.
22      Here, defendant has failed to plead that barrier removal is
    not readily achievable in its answer.  Accordingly, the defense is
23  waived.  Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 819
    (9th Cir. 2004).  While plaintiff has not come forward with any
24  evidence regarding barrier removal, he need not do so where such
    evidence  would  be  unnecessary,  given  defendant's  waiver.   In
25  contrast, the Colorado Cross court noted that the defendant in that
    case  had  properly  pled  that  barrier  removal  was  not  readily
26  achievable as an affirmative defense.  Id., n.3.

**1. Cut-Out Curb Ramp**

Defendant concedes that the slope of the cut-out curb ramp is in violation of ADAAG § 4.7.2 and 4.8.2.[8]  However, it defends this non-compliance on two grounds.  First, defendant states, without any accompanying evidence, that fixing the grade "would be several thousand dollars."  Gogri Decl. ¶ 11(b).  However, as noted above, defendant waived its ability to make this argument when it failed to plead that the barrier removal was not "readily achievable" as an affirmative defense.  Second, defendant maintains that the degree of non-compliance is de minimis and did not render the restaurant inaccessible.  The argument misapprehends the law.  Ultimate access is not a defense under the ADA.  See Boemio v. Love's Rest., 954 F. Supp. 204, 208 (S.D. Cal. 1997) ("The standard cannot be 'is access achievable in some manner'.  We must focus on the equality of access.  If a finding that ultimate access could have been achieved provided a defense, the spirit of the law would be defeated.").

**2. Restroom Door**

There is no genuine dispute that the men's restroom door is inaccessible in several respects.  First, there is not a 12-inch strike side clearance on the push side of the door required by ADAAG § 4.13.6.  Defendant claims that fixing this violation would cost $70,000 and that it does not render the restroom inaccessible.  Both

---

[8] Title III gives the Department of Justice authority to develop regulations implementing the requirements of the ADA.  42 U.S.C. § 12186(b).  Pursuant to this authority, the Attorney General adopted the ADA Accessibility Guidelines ("ADAAGs") codified at 28 C.F.R. Pt. 36, Appendix A.  See Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).

1  these arguments are unavailing, for the reasons noted above.  Second,

2  the door pressure required to open the door is 12 pounds, exceeding

3  the 5 pound maximum allowed by ADAAG § 4.13.11.  Defendant has no

4  response to this contention and its accompanying evidence.  Third,

5  plaintiff presents evidence that the door-stop prevents the door from

6  opening to a full 90 degrees.  ADAAG § 4.13.5.  Again, defendant fails

7  to respond to this point.

8  **3. Toilet Paper Dispenser**

9  Plaintiff also provides evidence that the toilet paper dispenser

10 is too far from the back wall.  Specifically, it is 42 inches away,

11 exceeding the maximum 36 inches allowed.  ADAAG § 4.17.3; Fig. 30(d).

12 Wilson Decl. II, ¶ 3(c), Ex. E.  Defendant states that the dispenser

13 was moved and was in compliance as of November 27, 2006.  However,

14 plaintiff visited the restaurant on November 30, 2006, and took

15 pictures of the restroom, placing a measuring tape along the wall to

16 document the distance from the back wall to the dispenser.  There is

17 no genuine dispute that the dispenser location is still in violation.

18 **4. Interior Door Handle of Restroom Door**

19 Plaintiff states that the inside door handle of the restroom

20 door requires tight grasping, pinching, or twisting of the wrist to

21 operate, in violation of ADAAG §§ 4.27.4 and 4.13.9.  Defendant has no

22 response to this, aside from stating that "It is impossible to comply

23 with a Complaint like this since it is so unclear."  Gogri Decl. ¶

24 11(e).  Having failed to produce any evidence, there is no genuine

25 dispute that the door handle is in violation of ADAAG §§ 4.27.4 and

26 4.13.9.

1    **5. Signage for Accessible Seating**

2    Defendant concedes that the required signage is often absent,

3 but claims that this is due to constant theft and vandalism.  However,

4 plaintiff's evidence indicates that as of November 30, 2006, after

5 defendant's opposition was filed, the signage was absent, just as it

6 was absent on each of plaintiff's previous visit.  While the court

7 must draw all reasonable inferences in favor of defendant, here, it

8 would be unreasonable for the court to presume that the signage

9 happens to have been stolen all thirteen times that plaintiff can

10 document that he visited the restaurant.  Accordingly, there is no

11 genuine dispute that defendant has violated the relevant ADAAGs

12 regarding required signage.  ADAAG §§ 4.1.2(7), 4.1.16(3), 4.30.3.

13    **6. "No Parking" Painted in Access Aisle**

14    Plaintiff concedes that, at present time, defendant has remedied

15 this problem.  Accordingly, the motion with regard to this issue is

16 moot.

17    In sum, the court finds that there is no genuine dispute that

18 plaintiff has satisfied all the elements of his ADA claim with respect

19 to all five of the outstanding architectural barriers described above

20 that have yet to be removed.  Accordingly, the motion for summary

21 judgment for the ADA claim is granted.

22 **B. State Law Claims**

23    Plaintiff also moves for summary judgment with respect to his

24 state law cause of action under the Unruh Act and the Disabled Persons

25 Act ("DPA"), and seeks damages under the former.  Both statutes

26 incorporate the ADA by reference.  The Unruh Act was amended in 1992

12

1  to include the following language (now codified at Cal. Civ. Code §

2  51(f)): "A violation of the right of any individual under the

3  Americans with Disabilities Act of 1990 (Public Law 101-336) shall

4  also constitute a violation of this section."  One critical difference

5  between the ADA and the Unruh Act, however, is the available remedy.

6  The Unruh Act provides for a minimum damages of $4,000 per violation,

7  Cal. Civ. Code § 52(a), while the only remedy available under Title

8  III of the ADA is injunctive relief, 42 U.S.C. § 12188(a)(1).  Under

9  the ADA, damages are not recoverable.  Wander v. Kaus, 304 F.3d 856,

10  858 (9th Cir. 2002).

11      Here, defendant argues that in order to obtain damages

12  authorized by the Unruh Act, plaintiff must demonstrate that defendant

13  had an intent to discriminate.  The argument is premised upon a recent

14  California intermediate appellate court decision, Gunther v. Lin, 50

15  Cal. Rptr. 3d 317 (Cal. Ct. App. 2006), which was decided after

16  plaintiff's motion was filed.[9]  Where the highest court of a state has

17  not pronounced upon an issue of state law, as is the case here, a

18  federal court sitting in diversity must use its own best judgment to

19  predict how that court would decide the issue.  Takahashi v. Loomis

20  Armored Car Serv., 625 F.2d 314, 316 (9th Cir. 1980).

21      In conducting this analysis, a federal court looks to guidance

22  from state appellate court opinions, well-reasoned decisions from

23  other jurisdictions, and treatises.  U.S. v. Colin, 314 F.3d 439, 443

24  (9th Cir. 2002).  Because a federal court must take into account "all

25  ────────────────

26      [9] The California Supreme Court denied the petition for review
   on January 17, 2007.

13

1  available data," <u>Estrella v. Brandt</u>, 682 F.2d 814, 817 (9th Cir.

2  1982), the decision of a California intermediate appellate court is

3  not controlling.  <u>Dimidowich v. Bell & Howell</u>, 803 F.2d 1473, 1482

4  (9th Cir. 1986) ("'[D]ecisions by California Courts of Appeal are

5  merely data'") (quoting <u>Am. Sheet Metal, Inc. v. EM-KAY Eng'g Co.</u>, 478

6  F. Supp. 809, 813 (E.D. Cal. 1979) (Karlton, J.)).  Of course, such a

7  decision "is not to be disregarded by a federal court unless it is

8  convinced by other persuasive data that the highest court of the state

9  would decide otherwise."  <u>Estrella</u>, 682 F.2d at 817.

10      **1. Prior Ninth Circuit Law**

11      As a threshold matter, the court notes that the holding of

12  <u>Gunther</u> directly contradicts that of <u>Lentini v. Calif. Ctr. for the</u>

13  <u>Arts</u>.  270 F.3d 837 (9th Cir. 2004).  There, the Ninth Circuit held

14  that because plaintiffs need not prove discriminatory intent under the

15  ADA, plaintiffs also need not prove discriminatory intent under the

16  Unruh Act, which imported ADA standards of liability.  <u>Id.</u> at 847.

17  This holding was in accord with the extant case law at the time, which

18  also held that intent was not required.  <u>See</u>, <u>e.g.</u>, <u>Presta v.</u>

19  <u>Peninsula Corridor Joint Powers</u>, 16 F. Supp. 1134, 1135 (N.D. Cal.

20  1998) ("Because the Unruh Act has adopted the full expanse of the ADA,

21  it must follow, that the same standards for liability apply under both

22  Acts.").

23      <u>Gunther</u>'s holding raises the issue for district courts

24  as to whether they are bound by <u>Lentini</u> or are now obligated to

25  reconsider the matter in light of the subsequent opinion by an

26  intermediate court of the state.  The state of the law is less

14

than clear.  In <u>In re Watts</u>, the Ninth Circuit held that an

intervening decision by an intermediate court requires that

court to reconsider a previous contrary opinion.  <u>In re Watts</u>,

298 F.3d 1077, 1083 (9th Cir. 2002).  This does not answer the

question of whether a district court is free to disregard the

Circuit's previous opinion, a question which has divided courts

around the country.[10]  Happily, this court need not answer that

question.[11]  Whatever else is true, it is clear that federal

courts are free to disregard the decisions of intermediate state

courts where there is "convincing evidence" that the state's

highest court would decide differently.  <u>In re Watts</u>, 298 F.3d

at 1083.  Here, there is convincing evidence suggesting that the

decision is not likely the law of the state of California.[12]

---

[10] <u>Compare</u> <u>In re E&S Dist. Asbestos Litig.</u>, 772 F. Supp. 1380,
1391 (S.D.N.Y. 1991), <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d 862,
866 (10th Cir. 2003), <u>Aceto v. Zurich Ins. Co.</u>, 440 F.2d 1320,1322
(3rd Cir. 1971), <u>and</u> <u>Nussbaum v. Mortgage Serv. America Co.</u>, 913 F.
Supp. 1548, 1554 (S.D. Fla. 1995) <u>with</u> <u>Taco Bell Corp. V. Cont'l Cas.
Co.</u>, 388 F.3d. 1077-79 (7th Cir. 2004).

[11] The problem is particularly troublesome in California.  I
have previously noted the relative weakness of the doctrine of
<u>stare decisis</u> in California jurisprudence.  <u>See</u> <u>Froyd v. Cook</u>, 681
F. Supp. 669, 672 n.9 (E.D. Cal. 1988).  There, after examining the
status of the doctrine within the state, I observed that a "federal
district court need give no greater weight to intermediate
appellate decisions than the superior court of the state does."
<u>Id.</u>; <u>see also</u> <u>Ortland v. County of Tehama</u>, 939 F. Supp. 1465, 1468
(E.D. Cal. 1996).  I am not aware of any change in California law
bearing upon the issue.

[12] This is so even though the California Supreme Court denied
review in <u>Gunther</u>.  Denial of review is "not [] without
significance," but review may be denied for any number of reasons
(including, for instance, the fact that there is not yet an
appellate district split on an issue), and it does not necessarily
signal the California Supreme Court's approval of a particular

1        **2. <u>Gunther</u>**

2        In short, <u>Gunther</u> held what every other court before it has

3   rejected: that proof of intent is required to collect damages for

4   disability discrimination under the Unruh Act, which authorizes a

5   minimum of $4,000 per violation.  50 Cal. Rptr. 3d at 325; Cal. Civ.

6   Code § 52(a).  The court reached this conclusion by interpreting the

7   1992 legislation that amended the Unruh Act to include disability

8   discrimination.  Specifically, it found that this legislation did not

9   overrule <u>Harris v. Capital Growth Investors XIV</u>, 52 Cal. 3d 1142, 1172

10  (1991), which, in rejecting a disparate impact theory of sex

11  discrimination, noted that the statute's language (e.g., "denies,"

12  "aids or incites a denial," "make any discrimination," and "offense")

13  appeared to cover only intentional discrimination.  This language was

14  not altered by the 1992 legislation.

15       Conceptually, then, <u>Gunther</u> envisions a two-step process for

16  obtaining damages: first, the plaintiff must prove that the defendant

17  engaged in discrimination, Cal. Civ. Code § 51, and second, that the

18  discrimination was intentional, Cal. Civ. Code § 52.  According to

19  <u>Gunther</u>, the 1992 legislation altered the first step (by expanding the

20  class of prohibited discrimination to include disability

21  discrimination) but did nothing to alter the second step.

22       <u>Gunther</u>'s reasoning is flawed from the outset.  Its conclusion

23  is premised on the view that the Unruh Act is comprised only of

24  Section 51, but this divorces the law from its enforcement provision

25  _____

26  case.  <u>DiGenova v. State Bd. of Educ.</u>, 57 Cal. 2d 167, 178 (1962).

                                    16

1  in Section 52.  While <u>Gunther</u> notes that, by its own terms, the Unruh

2  Act comprises only Section 51, the case that <u>Gunther</u> cites for this

3  proposition goes on to say that courts "have consistently described as

4  Unruh Civil Rights Act claims causes of action based under seemingly

5  related provisions set forth in sections of the Civil Code that follow

6  section 51." <u>Gatto v. County of Sonoma</u>, 98 Cal. App. 4th 744, 756

7  (2002).  Indeed, even the <u>Harris</u> court referred to the Unruh Act as

8  encompassing the enforcement provision found in Section 52.  52 Cal.

9  3d at 1172 (referring to Section 52 as "the language of the Act").[13]

10 Accordingly, when the 1992 legislation made a violation of the ADA a

11 per se violation of the Unruh Act, it also intended that these victims

12 of disability discrimination would be entitled to the remedies

13 afforded in the enforcement provision.

14          **a. Plain Meaning**

15      The traditional rules of statutory construction compel the same

16 conclusion.  The first step of statutory construction is to assign the

17 "usual and ordinary meanings" to the words of a statute.  <u>Wells v.</u>

18 <u>One2One Learning Found.</u>, 29 Cal. 4th 1164, 1170 (2006).  "If the words

19 themselves are not ambiguous, we presume the Legislature meant what it

20 said, and the statute's plain meaning governs." <u>Id.</u>

21      Here, the language of the 1992 legislation, codified in (now)

22 Section 51(f), could not be clearer: "A violation of any right of any

23 individual under the [ADA] shall also constitute a violation of this

24 _____

25      [13] Furthermore, as discussed below, the legislative history to
   Section 51(f) also indicates that the legislature viewed the Unruh
26 Act as comprising both Sections 51 and 52.

17

section."  As noted above, "this section" refers to the Unruh Act,

including its enforcement provision in Section 52.  Every court to

have considered the issue with the exception of <u>Gunther</u> has read

Section 51(f) as not requiring proof of intent.  <u>See</u>, <u>e.g.</u>, <u>Lentini</u>,

370 F.3d at 847; <u>Presta</u>, 16 F. Supp. 2d at 1136; <u>Hubbard v. Twin Oaks</u>

<u>Health and Rehabilitation Ctr.</u>, 408 F. Supp. 2d 923, 928-99 (2004)

(Karlton, J.); <u>Boemio</u>, 954 F. Supp. at 208.

### b. Legislative History

The legislative history of Section 51(f) reveals an intent to

include unintentional disability discrimination within the scope of

the Unruh Act.  The Assembly Committee on Judiciary report on AB 1077

(as amended January 2, 1992, p.2) stated that the bill would: "Make a

violation of the ADA a violation of the Unruh Act.  Thereby providing

persons injured by a violation of the ADA with the remedies provided

by the Unruh Act (e.g., right of private action for damages)."  The

description in the Senate Committee on Judiciary report on AB 1077 (as

amended June 1, 1992, p. 5) expressed a similar view.[14]

Also of particular significance is a letter from a labor law

advisor for the California Chamber of Commerce to the bill's author

which stated that the proposed bill would expose operators of places

of public accommodations "to greater liability [than the ADA], even

for unintentional violations of the new federal standard."  <u>Gunther</u>,

50 Cal. Rptr. 3d at 337 (quoting letter from Malanie Wiegner, Labor

---

[14] "[T]his bill would make a violation of the ADA a violation of the Unruh Act.  Thereby providing persons injured by a violation of the ADA with the remedies provided by the Unruh Act (e.g., right of private action for damages, including punitive damages)."

1  Law Advisor, California Chamber of Commerce, to Honorable Bruce

2  Bronzan, dated June 1, 1992, at page 2).

3      _Gunther_ sweeps this letter aside.  The court argues that the

4  Disabled Persons Act "does indeed [] allow for greater liability for

5  the ADA than the ADA itself allows."  _Id._ at 337.  But, quite

6  obviously, the legislature was voting on changes to the Unruh Act, not

7  the DPA, and the letter was referring to the higher liability imposed

8  by the former, not the latter.  Of course, a lone letter is not

9  controlling, but, as the only piece of legislative history to squarely

10 address the issue of intent, it is nonetheless extremely relevant.

11 And it is certainly more relevant than the inference _Gunther_ attempts

12 to draw from the "little opposition" that the bill drew from business

13 groups.  _Id._ at 337.

14     As the court in _Cross_ recently noted in a post-_Gunther_ decision,

15 "the result under _Gunther_ [] leaves a successful ADA plaintiff without

16 a corresponding Unruh Act remedy [and] undermines the California

17 legislature's purpose in passing section 51(f) to provide that a

18 violation of the ADA is also a violation of the Unruh Act."  _Cross v._

19 _Pac. Coast Plaza Invs., L.P._, 2007 U.S. Dist. LEXIS 16138, *15 (S.D.

20 Cal. Mar. 6, 2007).  Like the court in _Cross_, this court also

21 "presumes that the California legislature did not intend section 51(f)

22 to be a law that is all bark and no bite."[15]  _Id._, at *15-16.

23

24     [15] The court in _Cross_ ultimately declined to exercise
    supplemental jurisdiction over plaintiff's Unruh Act claims in the
    interests of comity.  Here, however, and in contrast to _Cross_,

25 defendants have not filed a motion to dismiss the supplemental
    state law claims.  Furthermore, the court finds that the issue of

26 state law presented by the instant action is not particularly novel

1            **c. Liberal Construction**

2        If the language of the Section 51(f) were ambiguous, and the

3    legislative history unclear -- which they are not -- the California

4    Supreme Court has also held that the Unruh Act must be interpreted "in

5    the broadest sense reasonably possible" in order to "banish

6    [discriminatory] practices from California's community life."

7    <u>Isbister v. Boys' Club of Santa Cruz, Inc.</u>, 40 Cal. 3d 72, 76 (1985);

8    <u>see</u> <u>also</u> <u>Presta</u>, 16 F. Supp. at 1136; <u>Burks v. Poppy Constr. Co.</u>, 57

9    Cal. 2d 463, 468 (1962).  If this statement is to have any force

10   beyond mere rhetoric, it must be applied to situations such as this

11   one, where a court might construe a statute in two different ways, one

12   narrow and one broad.

13       Moreover, liberal construction of the Unruh Act is needed to

14   banish the discriminatory practices at issue here.  As Judge Henderson

15   recognized in <u>Presta</u>, disability discrimination is simply different

16   than other forms of discrimination.  "Combating discrimination as it

17   affects persons with disabilities requires recognizing . . . that

18   often the most damaging instances in which rights of persons with

19   disabilities are denied come not as the result of malice or

20   discriminatory intent, but rather from benevolent inaction when action

21   is required."  16 F. Supp. 2d at 1136.  <u>See</u> <u>also</u> <u>Boemio</u>, 954 F. Supp.

22   at 208 n.4.

23       As discussed below, there is an obvious practical connection

24   between the availability of the $4,000 damage minimum and the

25   _____

26   or complex in light of the overwhelming body of case law finding
     that proof of intent is not required.

1  enforcement of the ADA.  Second, injunctive relief was already

2  available in 1992, when the Unruh Act was amended to include

3  disability discrimination.  Because of the "sweeping" coverage of

4  California's Unfair Competition Law, see Wilner v. Sunset Life Ins.

5  Co., 78 Cal. App. 4th 952, 964 (2000), injunctive relief for ADA

6  violations was already available under state law.  Accordingly, if

7  this court were to follow Gunther, it would nullify the 1992

8  legislation, and it is clear that courts may not conclude that the

9  legislature engaged in an idle gesture.  Viking Pools v. Maloney, 48

10  Cal. 3d 602, 609 (1998).

11              **d. Other Canons of Statutory Construction**

12       Gunther also relies upon three canons of statutory construction:

13  avoidance of statutory redundancy/nullification, the rule of

14  reasonable construction, and legislative acquiescence.  50 Cal. Rptr.

15  4th at 327-33, 338-39.  As explained below, the court finds that none

16  of these canons alters the conclusion that the Unruh Act covers

17  unintentional ADA violations.

18             **i. Avoiding Statutory Redundancy/Nullification**

19       First, Gunther argues that if the Unruh Act were read to include

20  unintentional ADA violations, it would nullify the DPA or render it

21  redundant.  The DPA has been interpreted to authorize damages of no

22  less than $1,000 per violation, even where no intent to discriminate

23  is shown.  See Donald v. Café Royale, 218 Cal. App. 3d 168, 177 1990).

24  According to Gunther, "the two statutes [the Unruh Act and the DPA]

25  dovetail nicely.  Where there is intentional discrimination, there is

26  a four times larger minimum penalty; if there isn't, plaintiff still

                                    21

1  recovers, but less." <u>Gunther</u>, 50 Cal. Rptr. 3d at 331.

2      I cannot agree.  The DPA and the Unruh Act are inevitably

3  redundant in some respects, no matter how the court construes the

4  latter.[16]  <u>Gunther</u> characterizes the DPA as covering only unintentional

5  discrimination, and the Unruh Act as covering only intentional

6  discrimination, but such is not the case.  Rather, the DPA authorizes

7  damages for both intentional and unintentional discrimination, because

8  intent is simply irrelevant under the statute.  <u>See</u> <u>Café Royale</u>, 218

9  Cal. App. 3d at 177 ("Viewing the statute reasonably and in a

10  commonsense fashion compels the conclusion that no intent element is

11  set forth.").  Accordingly, the portion of the DPA covering

12  intentional discrimination is inevitably redundant with the portion of

13  the Unruh Act covering intentional discrimination.[17]

14                    **ii. Rule of Reasonable Construction**

15      Second, <u>Gunther</u> argues that the rule of reasonable construction

16  also points toward adopting its interpretation of the Unruh Act.  <u>Id.</u>

17  ────────────────

18  [16] At the same time, it is not clear that the two prohibit the
same class of conduct, and it is possible that the DPA prohibits
19  a smaller category of discrimination tied to physical places.  The
Unruh Act entitles all individuals to "full and equal
20  accommodations, advantages, facilities, privileges, or services in
all business establishments of every kind whatsoever." Cal. Civ.
21  Code § 51.  By contrast, the DPA's language is narrower.  It
provides disabled people "with the same right as the general public
22  to the full and free use of the streets, highways, sidewalks,
walkways, public buildings, medical facilities, including
23  hospitals, clinics and physicians' offices, public facilities and
other public places." Cal. Civ. Code § 54(a).  Accordingly, it is
24  an open question whether the DPA covers discrimination unconnected
to a physical location, as in insurance discrimination, or
25  discrimination on the internet.

26  [17] Furthermore, as noted above, the <u>Gunther</u> court's
interpretation also risks nullifying Section 51(f).

                                22

1    at 338.  See Copley Press, Inc. v. Superior Court, 39 Cal. 4th 1272,

2    1291 ("To the extent [] examination of statutory language leaves

3    uncertainty, it is appropriate to consider the consequences that will

4    flow from a particular interpretation") (internal quotation marks

5    omitted).  Gunther argues that its interpretation is the more

6    reasonable one for two reasons.  First, it purportedly avoids

7    redundancy, an issue addressed above.  50 Cal. Rptr. 3d at 338.

8    Second, it allegedly avoids the "gross abuses of the judicial system"

9    that have been caused by an interpretation of the Unruh Act embracing

10   monetary liability for unintentional ADA violations (e.g., the Ninth

11   Circuit's holding in Lentini).  Id.

12       Gunther argues that ADA litigation has been spurred by the

13   minimum $4,000 penalty for "unintentional technical violations of the

14   ADAAGS" and cites with approval the lamentation of one district court

15   that "[d]espite the important mission of the ADA, there are those

16   individuals who would abuse its private cause of action provision by

17   filing lawsuits solely with the intent to profit financially."  Id.

18   (internal quotation marks omitted).[18]

19       As an initial matter, the fact that the Unruh Act contains a

20   damages provision that happens to provide an incentive for its

21   enforcement hardly lends support for a claim that the law is being

22   undermined.  Because insufficient public resources have been invested

23   in enforcing the law, and in educating the public about the ADA, this

24   _____

25       [18] One cannot but help noting the pious recognition of the
     statute's salutary purpose before each deprivation of a benefit
26   under the statute.

1   task has been left to private parties and their attorneys.  It would

2   be fundamentally unfair to, on the one hand, deny disabled people the

3   benefit of public enforcement, while, on the other, deprive them of an

4   incentive for their efforts at private enforcement.[19]

5        Furthermore, there is no basis in law for distinguishing between

6   "real" violations of the ADA and merely unintentional "technical"

7   violations of the ADA.  A court cannot pick and choose which

8   violations it deems serious enough to warrant relief under the Unruh

9   Act.  Presumably, no court would argue that placing a toilet paper

10  dispenser too far for a disabled person to reach with ease -- which is

11  what the defendant in this case did -- is merely a "technical"

12  violation.  The legislature has drawn clear lines with respect to what

13  is legal and what is illegal, and it is not for a court to arbitrarily

14  decide which violations are serious enough to warrant relief.

15                  **iii. Legislative Acquiescence**

16       Third, Gunther invokes the doctrine of legislative acquiescence

17  in finding that the legislature did not overrule Harris.  Gunther, 50

18  Cal. Rptr. 3d at 327.  In short, it contends the California

19  legislature is presumed to be aware of prior judicial constructions of

20  statutes.  While the presumption is not conclusive, Harris, 52 Cal. 3d

21  at 1156, it is a factor to be considered.  Here, Gunther argues that

22  _____

23       [19] The court has already held elsewhere that the mere fact
     that a person has filed multiple lawsuits does not make him or her
24   a vexatious litigant.  Wilson v. Pier 1 Imports (US), Inc., 411 F.
     Supp. 2d 1196, 1200 (E.D. Cal. 2006) ("[T]he number of lawsuits
25   plaintiff has filed does not reflect that he is a vexatious
     litigant; rather, it appears to reflect the failure of the
26   defendants to comply with the law.").

1  since the legislature amended the Unruh Act in 1992, but failed to

2  change the language construed by Harris as requiring intent, the

3  legislature approved of the court's judicial construction.

4       The doctrine of legislative acquiescence is of little assistance

5  here.  First, as noted above, the case law prior to Gunther has

6  uniformly held that intent was not required to obtain damages for

7  disability discrimination.  If the legislature had acquiesced to

8  anything, it was that body of case law spanning multiple years, not a

9  few lines from Harris.  Second, even if the court acquiesced to

10 Harris, it is impossible to know which part they acquiesced to.

11 Harris rejected a disparate impact theory of sex discrimination for

12 multiple reasons, including, for example, the fact that there was no

13 language or history to suggest that the legislature envisioned

14 disparate impact as a viable claim, and that federal decisions at that

15 time were in conflict as to the availability of that claim.  52 Cal.

16 3d at 1172-73.

17      Finally, Gunther's discussion of legislative acquiescence is

18 circular.  Application of the doctrine serves to reinforce Gunther's

19 interpretation of the statute only if one accepts, as a starting

20 point, that the text of the statute does not evince an intent to

21 authorize damages for unintentional ADA violations.  In other words,

22 if one were to construe Section 51(f) as authorizing damages for

23 unintentional ADA violations based on its language, as the courts did

24 in Lentini and Presta, it would make no sense to say that the

25 legislature acquiesced to a judicial construction entirely contrary to

26 what it in fact intended.

1       In sum, the court concludes that a plaintiff may obtain damages

2   under the Unruh Act for violations of the ADA even without a showing

3   of intentional discrimination.   In light of both the legislative

4   history of the statute, and the directive to interpret the statute as

5   broadly as possible to effectuate its purposes, the court finds that

6   Gunther does not control.   Accordingly, the relief requested is hereby

7   granted, and plaintiff is entitled to $52,000 for defendant's thirteen

8   violations of the Unruh Act.

9                              **IV. Conclusion**

10      The motion for summary judgment is granted as to the ADA claim

11  and the Unruh Act claim.

12      IT IS SO ORDERED.

13      DATED:  March 22, 2007.

14

15

16                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
17                              UNITED STATES DISTRICT COURT

18

19

20

21

22

23

24

25

26

                              26